## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | | |
|---|---|---|
| CHUNHONG JIA; NAIHAN LI; NAIRUO LI; SHULEI WANG; LIZHONG YAO; WEIWEI ZHANG; CHONG ZHAO, | : : : : | Case No. : |
| Plaintiffs, | : : | |
| v. | : : | Judge: |
| BOARDWALK FRESH BURGERS & FRIES, INC. AND DAVID DIFERDINANDO, | : : : : | |
| Defendants. | : | |

---

## COMPLAINT

Now comes Plaintiffs Chunhong Jia, Naihan Li, Nairuo Li, Shulei Wang, Lizhong Yao, Weiwei Zhang, and Chong Zhao ("Plaintiffs"), and for their Complaint against Defendants Boardwalk Fresh Burgers & Fries, Inc. ("BWBF") and David DiFerdinando ("DiFerdinando") (collectively, "Defendants"), state:

## THE PARTIES

1.     Plaintiffs are citizens and residents of the People's Republic of China, and are limited partners of Boardwalk Fries Opportunities, LP ("BWF OPP").  In 2014 and 2015, Plaintiffs joined BWF OPP, an Ohio limited partnership organized to allow foreign investors (like Plaintiffs) to utilize the EB-5 Visa program to gain lawful residency in the United States.

2.     Defendant Boardwalk Fresh Burgers & Fries, Inc. is a Delaware Corporation with its principal place of business located at 9220 Rumsey Road, Suite 101, Columbia, Maryland 21045.  BWBF is a member of Boardwalk Fries, LLC ("Boardwalk LLC"), which is a member

of BWF MGMT, LLC ("BWF MGMT"), the former general partner of BWF OPP.   BWBF is responsible for franchising, owning, and sometimes operating Boardwalk Fries Burgers Shakes ("Boardwalk Fries") restaurants in Florida and other locations.

3.      Defendant David DiFerdinando is a citizen and resident of the State of Florida with a residence address of 130 Brightwater Drive, Unit 2 in Clearwater, Florida 33767. DiFerdinando is the president of and a shareholder in BWBF.  DiFerdinando is also the president and member of Boardwalk LLC, which is a member of BWF MGMT.

## JURISDICTION AND VENUE

4.      The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because this civil action involves complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

5.      Pursuant to 28 U.S.C. § 1391, venue is proper in this Court because a substantial part of the events or omissions giving rise to the claims occurred in this District.

6.      This Court has personal jurisdiction over Defendants because they are subject to personal jurisdiction in this District.  Defendants have minimum contacts with Florida such that maintaining this action does not offend traditional notions of fair play and substantial justice.

7.      Specifically, Defendants have transacted business and caused tortious injury in Florida as described in this Complaint.  Defendants have also purposely availed themselves of acting in Florida, this lawsuit arises from their contacts in Florida, and their contacts with Florida have a substantial enough connection with Florida to make the exercise of personal jurisdiction in this Court reasonable.

8.      DiFerdinando, for example, is a citizen and resident of Florida.

9.     As detailed herein, during relevant times, DiFerdinando acted in Florida in a personal capacity, and/or as the president of and a shareholder in BWBF.

10.     DiFerdinando's activities, and those of other BWBF employees and officers, in Florida as detailed herein highlight BWBF's lengthy and significant relationship with Florida. This relationship began as early as September 2010, when BWBF executed an agreement with a master franchisee to open and operate 50 restaurants in Florida.  Some Florida restaurants were developed in connection with this agreement, including restaurants located in Boca Raton and Orlando, Florida.

11.     DiFerdinando previously described the Boca Raton restaurant as "our launch pad for the rest of the state."

12.     As is detailed herein, Defendants also conspired with three Florida residents, Gary Chan, Terry Chan and Jacqueline Chan (collectively, the "Chans"), to harm Plaintiffs. Defendants are accordingly subject to personal jurisdiction in Florida and this District.

## NATURE OF THE ACTION

13.     This is an action that Plaintiffs assert against Defendants for, among other things, breach of contract, unjust enrichment/quantum meruit, gross negligence, breach of fiduciary duty, conversion, fraud, conspiracy, piercing the corporate veil, and punitive damages to remedy Defendants' unlawful actions, which include gross mismanagement, embezzlement, and self-dealing of Plaintiffs' investment proceeds in BWF OPP.

14.     Defendants have conspired with and participated in a complex enterprise, individually and through their authorized agents, the Chans, to defraud Plaintiffs and convert over $3,500,000 in Plaintiffs' funds.

15.     Terry and Jacquelyn Chan are currently citizens and residents of Florida.  During relevant times, Gary Chan was also a citizen and resident of Florida.

16.     Plaintiffs filed a lawsuit against Defendants in the United States District Court for the Southern District of Ohio on July 26, 2018.  On September 6, 2019, an order was entered dismissing this action for lack of personal jurisdiction.  This action is now being filed here because of DiFerdinando's Florida citizenship and residency, BWBF's substantial relationship with Florida, and because misconduct alleged herein occurred in Florida and in this District.

## THE EB-5 PROGRAM

17.     In 1990, Congress established the EB-5 Program in order to bring new investment capital into the United States and create new jobs for U.S. workers.

18.     Under the EB-5 Program, immigrants who invest their capital in job-creating business enterprises in the U.S. receive "conditional" permanent resident status in the U.S. for two (2) years after their I-526 application is approved. If, after the two-year period, the immigrants satisfy the EB-5 Program conditions and other Program criteria, USCIS removes the conditions and the immigrant investors become lawful permanent residents. In other words, the immigrant investors obtain their "Green Cards."

19.     In essence, the EB-5 Program has three key components: (a) immigrant investment of capital; (b) in a new commercial enterprise; that (c) creates jobs.

20.     To avail oneself of the EB-5 Program, the immigrant investor must invest at least $1,000,000 of capital in new commercial enterprise that creates at least 10 jobs, unless the immigrant invests his or her capital in what is called a "targeted employment area." In that case, the immigrant must invest $500,000.

21.     Defendants, conspiring with the Chans, used the EB-5 Program to lure each

Plaintiff into investing $500,000 in BWF OPP, a purported development project in Ohio that was supposed to develop BWBF restaurant locations in the Cincinnati and Dayton metropolitan areas. Most, if not all, of Plaintiffs' combined $3,500,000 investment has been unlawfully converted by Defendants and the Chans without Plaintiffs' consent as a result of Defendants' involvement in promoting and facilitating this unlawful scheme.

## DEFENDANTS CONSPIRE WITH THE CHANS TO CREATE THE EB-5 PROJECT STRUCTURE

22.    In or about July 2013, DiFerdinando was introduced to Terry Chan by a mutual acquaintance. Thereafter Terry Chan, Gary Chan, and Defendants began collaborating on the EB-5 Project involving the development of BWBF restaurants (the "Project").

23.    Defendants, Terry Chan, and Gary Chan ultimately agreed that the Project would consist of 3 entities: (a) BWF OPP, which is the vehicle used to obtain funding from foreign investors eager to use the EB-5 Program to gain permanent U.S. residency; (b) BWF MGMT, which was intended to be BWF OPP's general partner; and, (c) Boardwalk LLC, which was intended to be the managing member of BWF MGMT.

24.    Defendants and the Chans directed and controlled these entities such that no entity had a separate mind, will or existence of its own.

25.    Patricia Lang ("Ms. Lang"), BWBF employee and personal assistant to DiFerdinando, referred to BWF MGMT as "our mgt LLC" in a December 3, 2013 email, and stated that Defendants anticipated using BWF MGMT to launch other EB-5 programs that did not involve the Chans. A true and correct copy of Ms. Lang's December 3, 2013, email is attached hereto as **Exhibit A**.

26.    Between July 2013 and November 2013, Defendants, Terry Chan, and Gary Chan finalized the Project's above-stated structure. The Chans and Defendants were partners and

conducted Boardwalk LLC as a business partnership among them.

27.     On December 10, 2013, after further discussions with Terry Chan and Gary Chan, DiFerdinando executed an Operations Management Agreement purportedly on behalf of Boardwalk LLC.  A true and correct copy of this Operations Management Agreement is attached hereto as **Exhibit B**.

28.     However, DiFerdinando knew Boardwalk LLC did not exist as a legal entity at that time, as evidenced by the Articles of Organization that were filed with the Ohio Secretary of State on November 5, 2015, a true and correct copy of which are attached hereto as **Exhibit C**. Therefore, DiFerdinando signed the Operations Management Agreement personally, and/or as an agent, officer, or employee of BWBF.

29.     Under the Operations Management Agreement, Boardwalk LLC (and therefore Defendants) agreed to perform several duties BWF MGMT owed to Plaintiffs as BWF OPP's general partner, including:

- Providing executive level and strategic oversight for BWF OPP as a whole;

- Providing staff training for each BWF OPP restaurants;

- Assisting BWF OPP in meeting EB-5 Program requirements;

- Providing information regarding BWBF's system, franchise, or other information consistent with BWBF's franchise materials; and,

- Cooperating with the Chans for all EB-5 reporting requirements.

30.     Defendants knew that their involvement in BWF OPP was integral to its success. For example, in the Operations Management Agreement, BWF MGMT represented that it would rely "exclusively" on Boardwalk LLC's (and therefore Defendants') "expertise and knowledge" as to "all matters involving the administrative, accounting, and compliance and operations of the restaurants owned," by BWF OPP.

31.     Defendants knew that the Operations Management Agreement would be used when soliciting BWF OPP investors such as Plaintiffs, and that this document would build BWF OPP's credibility with prospective investors such as Plaintiffs.

32.     For example, on April 9, 2018, DiFerdinando was deposed in connection with *Jia, et al. v. Gary Chan, et. al.*, Case No. 1:18-cv-00085 (S.D. Ohio).   During his deposition, DiFerdinando testified that the Operations Management Agreement was executed "to lend credibility and confidence in the investors that, that we were committed and making sure that these [restaurant] locations got up and running."   A true and correct copy of relevant excerpts from DiFerdinando's deposition are attached hereto as **Exhibit D** at 112:5-113:1.

33.     In addition to the Operations Management Agreement, on December 10, 2013, DiFerdinando executed BWF OPP's Agreement of Limited Partnership (the "Partnership Agreement") purportedly in his capacity as "President" of Boardwalk LLC.   A true and correct copy of the Partnership Agreement is attached hereto as **Exhibit E**.

34.     However, because DiFerdinando knew Boardwalk LLC did not legally exist at that time, DiFerdinando entered into the Partnership Agreement individually and/or as an agent, officer, or employee of BWBF.

**DEFENDANTS AND THE CHANS SOLICIT PLAINTIFFS'
INVESTMENTS INTO BWF OPP**

35.     Once Defendants and the Chans agreed upon BWF OPP's structure, they began formulating the materials used to lure Plaintiffs and other potential foreign immigrant investors into BWF OPP.

36.     In January 2014, Defendants sent the Chans various BWBF corporate documents to create the marketing and promotional materials for BWF OPP, such BWF OPP's Business Plan (the "Business Plan"). Defendants knew these materials would be used to establish

credibility for BWF OPP and solicit potential BWF OPP investors, like Plaintiffs, as evidenced by DiFerdinando's sworn testimony that these materials would inform investors that "we were a legitimate company." *See* **Exhibit D** at 139:3-140:19.

37.     All or some of these materials were also specifically requested by an agent of Plaintiffs.

38.     Shortly thereafter, in connection with the solicitation of Plaintiffs, Defendants and the Chans provided Plaintiffs, and/or Plaintiffs' agents, with the Business Plan.  The Business Plan detailed the scope of BWF OPP, how it would operate, and how it would be managed.

39.     Defendants conspired with the Chans to develop the content and statements contained in the Business Plan, and were integrally involved in the preparation, marketing, distribution, dissemination, and publication of these materials to Plaintiffs and/or Plaintiffs' agents.  A true and accurate copy of the Business Plan is attached hereto as **Exhibit F**.

40.     The Business Plan outlined BWF OPP's general structure, explained that BWF MGMT would act as BWF OPP's general partner, and detailed that Boardwalk LLC would act as BWF MGMT's managing member.  The Business Plan also represented that Boardwalk LLC "will manage the start-up and stabilization of each restaurant" BWF OPP would develop.

41.     Additionally, the Business Plan said that 12 foreign investors, such as Plaintiffs, would invest $500,000 each into BWF OPP, for a combined $6,000,000 investment.  After this investment, each Plaintiff would be admitted as a limited partner of BWF OPP.

42.     In addition to this $6,000,000 foreign investment, the Business Plan said that BWF MGMT would contribute $3,000,000 to BWF OPP.  BWF OPP was therefore supposed to be financed with a combined $9,000,000.

43.     The $3,000,000 contribution by BWF MGMT was characterized as a capital

contribution in the Business Plan, and was supposed to be used for both real estate and operational expenses. This included land and building costs, professional services expenses, and other pre-restaurant opening "soft costs."

44.     Furthermore, the Business Plan informed Plaintiffs that:

- BWF OPP would seek to build ten BWBF restaurants;

- Boardwalk LLC, the "managing member" of BWF MGMT, was founded in 1981 in Maryland, and operated BWBF restaurants in eight states;

- BWF MGMT and Boardwalk LLC would "oversee and control" the disbursement of BWF OPP's funds;

- BWBF's CEO, DiFerdinando, was part of BWF OPP's Management Team, along with Terry and Jacquelyn Chan;

- BWF OPP intended to return EB-5 investors' capital "at the latter" of the three-year anniversary of each investors' I-526 approval, or once each investors' I-829 application was approved by USCIS;

- Ten BWBF restaurants would be constructed in a two-year time period, with five restaurants being constructed in the first year, and five in the second year;

- The ten BWBF restaurants would be constructed by May 2016; and,

- Investors would receive their I-829 approvals in 2016.

Defendants' participation was consistently highlighted in BWF OPP's Business Plan, thereby representing to Plaintiffs that Defendants were integrally involved in the management and oversight of the project.

45.     DiFerdinando's presence on BWF OPP's Management Team was a material representation to investors as evidenced by his sworn testimony that that his listing on the management team was used "to lend credibility and confidence [to] the investors, that we were

committed and making sure that [BWBF restaurant] locations got up and running." *See* **Exhibit D** at 112:5-113:1.

46.     Defendants also provided interested investors and/or their agents, such as Plaintiffs, with BWF OPP's Partnership Agreement.

47.     The Partnership Agreement explains that BWF OPP is controlled by BWF MGMT, its general partner.  The Partnership Agreement also explained BWF OPP's purpose:

> The purpose and business of [BWF OPP] shall be to invest in and/or loan money to various entities in Targeted Employment Areas that are operating a business for the purposes of stimulating economic development and job creation through organizing and owning wholly owed [sic] subsidiaries to: (i) open and operate 10 Boardwalk Fries restaurant franchises in Ohio and (ii) own and lease real estate to such franchises[.]

This purpose was consistent with the terms of the Business Plan, which is referenced as an exhibit to the Partnership Agreement.

48.     The Partnership Agreement defines a "Targeted Employment Area" as an area that "has been designed by parties acceptable to the USCIS … [and] that has experienced unemployment of at least 150% of the national average rate at the time a Limited Partner made his or her Capital Contribution."

49.     The Partnership Agreement states that investors, such as Plaintiffs, will be admitted as a limited partner in BWF OPP if they decided to invest.

50.     Because BWF OPP was designed to comply with EB-5 regulations as a vehicle for Plaintiffs to obtain U.S. resident status, Plaintiffs could not be admitted into BWF OPP if their I-526 petitions were not approved.

51.     Importantly, no limited partner has "any right or power to take part in the management or control of the Partnership" under the Partnership Agreement.  Instead, BWF

MGMT controlled the Partnership as its general partner.

52.     BWF MGMT had a number of responsibilities under the Partnership Agreement. The "Management" section of the Partnership Agreement explains that BWF MGMT "shall have the sole and exclusive right and responsibility to manage the business of the Partnership."

53.     BWF MGMT had to care for BWF OPP's funds, including Plaintiffs' funds, pursuant to the Partnership Agreement.

54.     Further, the "Duties and Obligations of [the] General Partner" section of the Partnership Agreement states that BWF MGMT "shall cause the Partnership to conduct its business and operations separate and apart from that of the General Partner and its affiliates." This included BWF MGMT's responsibility to "segregat[e] Partnership assets" and to "not allow[] funds or other assets of the Partnership to be commingled with the funds or other assets of, held by, or registered in the name of [BWF MGMT] or any of its affiliates."

55.     This provision prohibited BWF MGMT from engaging in self-dealing and barred BWF MGMT from co-mingling BWF OPP's assets with the assets of other affiliated companies.

56.      This section also explains that:

> The General Partner shall take all actions that may be necessary or appropriate (i) for the continuation of the Partnership's valid existence as a limited partnership under the laws of the State of Ohio . . . to protect the limited liability of the Limited Partners or to enable the Partnership to conduct the business in which it is engaged and (ii) for the accomplishment of the Partnership's purposes, including the acquisition, development, maintenance, preservation and operation of Partnership's property in accordance with the provisions of [the Partnership Agreement] and applicable laws and regulations.

57.      BWF MGMT was accordingly required to take all actions necessary to ensure that BWF OPP remains a valid entity and to accomplish BWF OPP's purpose.

58.     BWF MGMT had to also ensure that "[a]ll property in the form of cash not otherwise invested" is deposited "for the benefit of the Partnership" in accounts belonging to the Partnership or its affiliates, in short-term liquid securities, or left in escrow.

59.     The Partnership Agreement bound BWF MGMT to specific performance of the contract, and explains that every partner, including Plaintiffs, "would be irreparably damaged if any of the provisions of this [Partnership] Agreement are not performed in their specific terms."

60.     Finally, the Partnership Agreement contains a Schedule of Partners ("Schedule"). This Schedule shows that BWF MGMT was required to make a $3,000,000 capital contribution to BWF OPP.

61.     As defined by the Partnership Agreement, a capital contribution is "the amount of money and fair market value of other property contributed to" BWF OPP, reduced by any returns or tax distributions.  This required the actual contribution of money or property to BWF OPP.

62.     This contribution was an essential and material representation to investors such as Plaintiffs, as it indicated that EB-5 investments would not be the only basis of funding for BWF OPP.  Further, this contribution reduced Plaintiffs' concerns that BWF MGMT might breach the contract or abscond with investor funds, as BWF MGMT would lose a substantial amount of its own funds if BWF OPP failed.

63.     Defendants agreed to personally provide the $3,000,000 capital contribution to BWF OPP, but ultimately failed to do so.

64.     That agreement was memorialized in an Affidavit DiFerdinando executed on January 17, 2014, which said:

> David DiFerdinando, in conjunction with, by and/or through Boardwalk Fresh Burgers & Fries, Boardwalk Fries, D's Inc[.]or other affiliated companies and partners, commit to contributing the sum of USD Three Million ($3,000,000) to Boardwalk Fries, Opportunities, L.P. via BWF MGMT, LLC. [1]

A true and correct copy of DiFerdinando's affidavit is attached hereto as **Exhibit G**.

65.    Defendants knew that this affidavit was essential to luring BWF OPP investors, including Plaintiffs, to invest in BWF OPP.  Defendants knew that this affidavit would be used to show BWF OPP investors and/or their agents, including Plaintiffs, that BWF OPP was capitalized and able to meet its financial commitment under the Partnership Agreement.

66.    This affidavit was also a commitment to potential investors that BWBF, and DiFerdinando personally, would substantially invest in BWF OPP, and that BWF OPP and/or DiFerdinando had already committed $3,000,000 to the project.

67.    Defendants' contributions were also a representation that certain start-up costs could be paid before Plaintiffs' funds were released from escrow.

68.    Defendants knew investors were relying on their promise and DiFerdinando's affidavit.  On January 13, 2014, days before this affidavit was signed, an agent of actual or potential BWF OPP investors, including Plaintiffs, emailed Terry Chan, Gary Chan, and Ms. Lang asking for a "[w]ritten affidavit stating the availability of at least USD$3mm in cash, which will be contributed" to BWF OPP "at the same time and in the stated proportions with EB-5 capital."  This agent also asked about the financial ability of Jardin Hill, a company controlled by the Chans, "to step in should BWF not be able to come up with the requisite cash."

69.    Upon information and belief, this email memorialized discussions between DiFerdinando, Terry Chan, Gary Chan, Ms. Lang, and the investors' representative that occurred on the phone earlier that day.

---

[1] "Boardwalk Fries" and "D's Inc." are the names of two companies affiliated with Defendants.

70.     Defendants' promise, as memorialized in the affidavit, directly responded to the request from Plaintiffs' representative.  It told actual and potential BWF OPP investors that Defendants would contribute "at least USD$3mm in cash" to BWF OPP.

71.     Defendants, however, had no intention of actually contributing $3,000,000 to BWF OPP in the form of cash or property contributions to BWF OPP.

72.     Instead, DiFerdinando has testified that Defendants planned on obtaining tenant allowances from landlords in the amount of $3,000,000 and counting these allowances as their "contribution."  Tenant allowances, however, are neither cash nor property, are not something that can be contributed to BWF OPP, and was not something Defendants or their affiliates could provide.  Furthermore, the affidavit itself makes no mention of tenant allowances.

73.     Defendants accordingly intentionally mislead Plaintiffs through their contribution promises and the affidavit.

74.     This was not the only false representation contained in materials provided to Plaintiffs and/or their agents.  As Plaintiffs would later find out, the Business Plan and Partnership Agreement provided to them were also false in significant and material ways, and their collective $3,500,000 in investment proceeds were never utilized to develop a single BWBF restaurant.

75.     Plaintiffs and/or their agents were provided with BWF OPP's Subscription Agreement and Private Placement Memorandum ("PPM") before they invested in BWF OPP. The PPM repeated many of the same misrepresentations contained in the Business Plan and Partnership Agreement.  A copy of the PPM is attached hereto as **<u>Exhibit H</u>**.

76.     On February 26, 2014, plaintiff Chunhong Jia entered into a Subscription Agreement offering to purchase one Unit in BWF OPP for $500,000.  A copy of Chunhong Jia's

signed Subscription Agreement is attached hereto as **Exhibit I**.

77.    On May 29, 2014, plaintiff Naihan Li entered into a Subscription Agreement offering to purchase one Unit in BWF OPP for $500,000.  A copy of Naihan Li's signed Subscription Agreement is attached hereto as **Exhibit J**.

78.    On May 22, 2014, plaintiff Nairuo Li entered into a Subscription Agreement offering to purchase one Unit in BWF OPP for $500,000.  A copy of Nairuo Li's signed Subscription Agreement is attached hereto as **Exhibit K**.

79.    On December 12, 2014, plaintiff Shulei Wang entered into a Subscription Agreement offering to purchase one Unit in BWF OPP for $500,000.  A copy of Shulei Wang's signed Subscription Agreement is attached hereto as **Exhibit L**.

80.    On May 22, 2015, plaintiff Lizhong Yao entered into a Subscription Agreement offering to purchase one Unit in BWF OPP for $500,000.  A copy of Lizhong Yao's signed Subscription Agreement is attached hereto as **Exhibit M**.

81.    On March 5, 2014, plaintiff Weiwei Zhang entered into a Subscription Agreement offering to purchase one Unit in BWF OPP for $500,000.  A copy of Weiwei Zhang's signed Subscription Agreement is attached hereto as **Exhibit N**.

82.    On January 27, 2014, plaintiff Chong Zhao entered into a Subscription Agreement offering to purchase one Unit in BWF OPP for $500,000  A copy of Chong Zhao's signed Subscription Agreement is attached hereto as **Exhibit O**.

83.    After they decided to invest in BWF OPP, and in performance of their obligations under the Subscription Agreement and PPM, Plaintiffs each deposited their $500,000 investment proceeds into individual U.S. Bank escrow accounts that BWF OPP controlled.  Plaintiffs' funds were held in the escrow accounts until their I-526 petitions were approved.

**DEFENDANTS FAIL TO DEVELOP RESTAURANTS, PERMIT PLAINTIFFS'
INVESTMENTS TO BE RELEASED FROM ESCROW AND STOLEN BY THE CHANS,
AND RECEIVE $330,000 OF PLAINTIFFS' FUNDS**

84.     Plaintiffs' I-526 petitions were approved in 2015.  This approval, long-overdue, was bittersweet.  While it represented another step forward in the EB-5 process, it also allowed the Chans and Defendants to misappropriate Plaintiffs' funds.

85.     Plaintiffs' funds were misappropriated through the use of several bank accounts, including a bank account in BWF OPP's name at General Electric Credit Union ("GECU").  Defendants and the Chans never informed Plaintiffs that this bank account was opened.

86.     On or about October 10, 2015, Gary Chan transferred $450,000 from each Plaintiff's U.S. Bank, NA ("U.S. Bank") escrow account, which cumulatively totaled $3,150,000, to BWF OPP's GECU bank account.

87.     The Chans later removed the remaining $50,000 in each Plaintiffs' escrow account and deposited those funds into BWF OPP's GECU bank account or other bank accounts they controlled.

88.     These transfers were performed pursuant to DiFerdinando's written authorization, which permitted Gary Chan to have unfettered access to Plaintiffs' escrow accounts.  A true and correct copy of DiFerdinando's authorization is attached hereto as **Exhibit P**.

89.     Specifically, DiFerdinando's authorization permitted Gary Chan to "sign documents, deposit funds, and provide written direction and authorization" to U.S. Bank on behalf of BWF OPP.  Defendants took no steps to monitor Gary Chans' activities or Plaintiffs' funds.

90.     The Chans would not have been permitted to remove Plaintiffs' funds from escrow without DiFerdinando's authorization.  Defendants therefore permitted and facilitated

approximately $3,500,000 in Plaintiffs' investment funds to be removed from escrow without any supervision, oversight, management, safeguards or other protections to ensure that Plaintiffs' investment proceeds would be used to further BWF OPP's business purpose.

91.     In November 2015, after a meeting with Terry Chan and Jacquelyn Chan, Defendants received at least $330,000 of Plaintiffs' misappropriated investment funds.   *See* **Exhibit Q**, which is a true and correct copy of BWBF's bank statement showing receipt of $330,000 from Jardin Hill, an entity the Chans used to facilitate their fraudulent scheme on Plaintiffs and other EB-5 investors.

92.     DiFerdinando has testified that Defendants knew that these funds could have originated from Plaintiffs' investments.   *See* **Exhibit D** at 145:12-146:1.

93.     In May 2016, with absolutely no progress being made on the EB-5 project in Ohio, Defendants and the Chans agreed to refocus their development efforts to Central Florida and the Northeastern United States.

94.     Plaintiffs were then informed that BWF OPP planned to open Boardwalk Fries restaurants in the following areas: (a) Bradenton, Florida; (b) Buena Vista, Florida; (c) Tampa, Florida; (d) Middletown, New York; (e) Poughkeepsie, New York; and, (f) Holyoke, Massachusetts.  However, Defendants and their co-conspirators and business partners, the Chans, never fully developed BWBF restaurants in those locations.

95.     Nonetheless, Defendants acted as if they were diligently working toward the development of restaurants sites for BWF OPP in these new regions, with a significant focus on Florida.  Defendants' employees worked with the Chans to develop architectural plans for Florida sites, obtain financing to develop Florida restaurant sites, order supplies for prospective Florida restaurants, develop food and drink options for Florida restaurant locations, develop

promotional and marketing materials, and to select outdoor signs for these Florida restaurants.

96.     In 2016 and 2017, Defendants and the Chans focused their efforts on two potential restaurant locations in Altamonte Springs, Florida, and Orlando, Florida.   While Defendants and the Chans considered other Florida restaurant sites, these two locations were their biggest focus.

97.     Defendants' employees also communicated with contractors to develop Florida restaurant locations and traveled to Florida to scout prospective restaurant locations.

98.     DiFerdinando himself actively participated in this Florida development activity. DiFerdinando scouted out potential Florida restaurant locations, met with and worked with Terry Chan in Florida to negotiate lease terms for Florida properties, reviewed and commented on architectural plans for Florida restaurants, and met with Terry and Jacquelyn Chan multiple times in Orlando, Florida regarding planned Florida restaurants, among other activities.

99.     BWBF employees and officers similarly traveled to Florida in connection with BWF OPP.   For example, John DiFerdinando, a member of BWBF's management team, met with Jacquelyn Chan in Florida in September 2016 to discuss menus and equipment for planned Boardwalk Fries restaurants in Florida.

100.     BWBF employees and officers were overall involved in all aspects of planning for these Florida restaurants, and reviewed and approved such things as the placing of equipment in anticipated spaces, signs for restaurants, employee uniforms, and the menus for each Florida restaurant.   BWBF even wanted its own employees to travel to Florida and train Florida restaurant employees "on site."

101.     While some demolition and other work occurred in at least one possible Florida restaurant location, the Florida development activity was mostly smoke at mirrors.   At that time,

18

Plaintiffs' investment proceeds were gone.  The Chans removed all Plaintiffs' investments from escrow, used these funds to finance a lavish lifestyle and to finance businesses unrelated to BWF OPP, and gave Defendants over $300,000 of Plaintiffs' funds.

## Count I – Fraud

102.    Plaintiffs restate paragraphs 1 through 101 as if fully rewritten.

103.    Defendants provided Plaintiffs and/or their agents, or knowingly caused Plaintiffs and/or their agents to be provided, with a Business Plan, Partnership Agreement, and other materials that contained a number of material misrepresentations or omissions about BWF OPP.

104.    Defendants had contractual duties to review and approve these materials, represented that they has seen the Business Plan, and executed the Partnership Agreement. Defendants also knowingly supplied false information used in these materials with the expectation that prospective investors, and Plaintiffs, would rely on this information when deciding whether they wanted to invest in BWF OPP.

105.    Defendants misrepresented key information in these materials, including the number of EB-5 investors who would invest in BWF OPP, the amount of BWF OPP's capital, the amount BWF MGMT would contribute to BWF OPP, and that Defendants would actively manage and oversee the development of BWBF restaurants and BWF OPP's finances. Defendants also misrepresented that Boardwalk LLC was a valid, existing entity.

106.    Defendants also supplied an affidavit that, on its face, represented that Defendants would contribute "the sum of USD Three Million ($3,000,000) to Boardwalk Fries, Opportunities, L.P. via BWF MGMT, LLC."  The representations in this affidavit, however, were knowingly false because Defendants never intended to contribute these funds to BWF OPP.

107.    Each of these false statements was made with knowledge, or which such disregard

and recklessness as to whether they were true or false that knowledge may be inferred.

108.    These statements were made with the intent of misleading Plaintiffs to rely on these statements.

109.    Plaintiffs justifiably relied on these false statements and/or omissions when deciding to invest in BWF OPP and when deciding to remain invested in BWF OPP.  These were material representations about the size, scope, and financing of BWF OPP, and about the risk of loss Plaintiffs faced in this investment.

110.    Defendants' misrepresentations proximately caused Plaintiffs' injuries and loss because Plaintiffs would not have invested in BWF OPP, and would not have remained invested in BWF OPP, but for these misrepresentations.

111.    These material misrepresentations also cut to the very core of BWF OPP's feasibility as stated in the Partnership Agreement and Business Plan.

112.    As a direct and proximate result of Defendants' fraud, Plaintiffs have been damaged in an amount in excess of $3,500,000, plus interest, attorney's fees, and costs, and any other relief as provided by law.  Plaintiffs' also seek punitive damages if this Court determines that Defendants' conduct constitutes fraud.

## Count II – Breach of Contract

113.    Plaintiffs restate paragraphs 1 through 101 as if fully rewritten.

114.    Defendants and BWF MGMT, which was controlled by Defendants independently and by and through Boardwalk LLC,  entered into the Partnership Agreement with Plaintiffs.

115.    The Partnership Agreement explicitly states that the purpose of BWF OPP is to open and operate ten Boardwalk Fries restaurants in Ohio.

116.    The Partnership Agreement further says, in a section titled "Duties and Obligations of General Partner," that BWF MGMT  "shall cause the Partnership to conduct its business and operations separate and apart from that of the General Partner and affiliates."  This includes BWF MGMT's responsibility to "segregat[e] Partnership assets" and to ensure the "funds or other assets of the Partnership to be commingled with the funds or other assets of, held by, or registered in the name of [BWF OPP] or any of its affiliates."

117.    BWF MGMT and Defendants had an obligation to care for Plaintiffs' funds, and could only maintain Partnership funds "not otherwise invested" in accounts belonging to the Partnership or its affiliates, in short-term liquid securities, or in escrow accounts.

118.    Defendants have failed to conduct themselves in good faith and in the best interests of the Partnership.  In doing so, Defendants have breached the Partnership Agreement and their duty of good faith by, among other things: (1) failing to ensure the Partnership conducted its business and operations separate and apart from BWF MGMT or its affiliates; (2) failing to segregate Plaintiffs' funds from the funds of BWF MGMT or any of its affiliates; (3) engaging in self-dealing; (4) failing to care for Plaintiffs' funds and allowing these funds to be converted; (5) failing to maintain Plaintiffs' funds in accounts belonging to BWF OPP or its affiliates, in short-term liquid securities, or in escrow accounts; and, (6) failing to contribute $3,000,000 to BWF OPP.

119.    Defendants also agreed to contribute $3,000,000 to BWF OPP, as represented in discussions with Plaintiffs' representative and memorialized in the affidavit.  Plaintiffs were parties to this agreement or, at the very least, intended beneficiaries of this agreement.

120.    Defendants breached this agreement when they failed to contribute $3,000,000 to BWF OPP.  This, among other things, prevented any Boardwalk Fries restaurants from being

constructed and materially harmed Plaintiffs.

121.    As a direct and proximate result of Defendants' numerous breaches of contract, Plaintiffs have been damaged in an amount in excess of $3,500,000, plus interest, attorney's fees, and costs, and any other relief as provided by law.

## Count III – Breach of Fiduciary Duty

122.    Plaintiffs restate paragraphs 1 through 101 as if fully rewritten.

123.    Defendants owe Plaintiffs a statutory, contractual, and common law duty of the utmost good faith and loyalty in the handling of the Project and their investment funds.

124.    This fiduciary relationship is confirmed by the Partnership Agreement, which granted the general partner "the sole and exclusive right and responsibility to manage the business" of BWF OPP.  Limited partners, such as Plaintiffs, did not "have any right or power to take part in the management or control of the Partnership or its business and affairs or to act for or bind the Partnership in any way."  Plaintiffs therefore relied on Defendants to act for their benefit and protect the Partnership.  The fiduciary relationship is also evidenced by the trust that Plaintiffs vested in Defendants to run BWF OPP so that it would satisfy EB-5 requirements and they would be in a position to secure their green cards.

125.    DiFerdinando executed this Partnership Agreement in his personal capacity, and/or as an agent, officer, or employee of BWBF.  Defendants therefore bound themselves to duties and representations contained in the Partnership Agreement.

126.    Given the fundamental nature of this Partnership and specific references to immigration processes in the Partnership Agreement, Defendants were under a duty to use their best efforts to run BWF OPP in a manner that would result in the creation of jobs and to secure Plaintiffs' EB-5 visas. Defendants have breached this duty to Plaintiffs by failing to open even a

single restaurant, and by allowing the embezzlement of Plaintiffs' funds.

127.    Defendants each owe a fiduciary duty towards Plaintiffs.

128.    Defendants breached this fiduciary duty by, among other things, converting and/or failing to safeguard Plaintiffs' funds, allowing the conversion of Plaintiffs' funds, failing to provide the oversight and management represented to Plaintiffs, and failing to ensure that BWF OPP carried out the purposes defined in the Partnership Agreement.

129.    As a direct and proximate result of Defendants' numerous breaches of their fiduciary duties toward Plaintiffs, Plaintiffs have been damaged in an amount in excess of $3,500,000, plus interest, attorney's fees, and costs, and any other relief as provided by law. Plaintiffs' also seek punitive damages if this Court determines that Defendants' conduct constitutes breach of fiduciary duty.

### Count IV – Negligence

130.    Plaintiffs restate Paragraphs 1 through 101 as if fully rewritten.

131.    Defendants owed Plaintiffs a duty of care to properly manage BWF OPP and their investment funds consistent with the Partnership Agreement, EB-5 rules and regulations, and the representations made to Plaintiffs as described above.

132.    This standard of care of a general partner in a limited partnership is detailed in Ohio and Florida state laws.  General partners accordingly owe limited partners duties of, among other things, loyalty and care.

133.    All of the Defendants negligently violated their duties to Plaintiffs by, among other things, participating in the following: (1) engaging in self-dealing transactions; (2) failing to ensure the Partnership conducted its business and operations separate and apart from BWF OPP or its affiliates; (3) failing to segregate Plaintiffs' funds from the funds of BWF MGMT or

any of its affiliates; (4) failing to invest funds according to the stated purposes and intent of the Partnership; (5) failing to maintain Plaintiffs' funds in accounts belonging to BWF OPP or its affiliates, in short-term liquid securities, or in escrow accounts; (6) failing to care for Plaintiffs' funds; and, (7) failing to contribute $3,000,000 to BWF OPP.

134.    The officers, directors, or managers of the Defendant business entities knowingly condoned, ratified, or consented to the conduct alleged in this claim, and their negligence contributed to the loss, damage, and injuries suffered by Plaintiff.

135.    As a direct and proximate result of Defendants' negligence, Plaintiffs have been damaged in an amount in excess of $3,500,000, plus interest, attorney's fees, and costs, and any other relief as provided by law. Plaintiffs' also seek punitive damages if this Court determines that Defendants' conduct constitutes negligence.

### Count V – Gross Negligence

136.    Plaintiffs restate Paragraphs 1 through 101 as if fully rewritten.

137.    Defendants owed Plaintiffs a duty of care to properly manage BWF OPP and their investment funds consistent with the Partnership Agreement, EB-5 rules and regulations, and the representations made to Plaintiffs as described above.

138.    This standard of care of a general partner in a limited partnership is detailed in Ohio and Florida state laws.  General partners accordingly owe limited partners duties of, among other things, loyalty and care.

139.    All of the Defendants actively and knowingly have violated their duties to Plaintiffs by, among other things, participating in the following: (1) engaging in self-dealing transactions; (2) failing to ensure the Partnership conducted its business and operations separate and apart from BWF OPP or its affiliates; (3) failing to segregate Plaintiffs' funds from the funds

of BWF MGMT or any of its affiliates; (4) failing to invest funds according to the stated purposes and intent of the Partnership; (5) failing to maintain Plaintiffs' funds in accounts belonging to BWF OPP or its affiliates, in short-term liquid securities, or in escrow accounts; (6) failing to care for Plaintiffs' funds; and, (7) failing to contribute $3,000,000 to BWF OPP.

140.   Defendants' conduct was so reckless or wanting in care that it constituted a conscious disregard or indifference to the rights, well-being, and funds of the Plaintiffs.

141.   Defendants' at all relevant times had actual knowledge of the wrongfulness of their conduct and the high probability that injury or damage to the Plaintiffs would result and, despite that knowledge, intentionally pursued that course of conduct, resulting in damages to the Plaintiffs.

142.   The officers, directors, or managers of the Defendant business entities knowingly condoned, ratified, or consented to the conduct alleged in this claim, and their gross negligence contributed to the loss, damage, and injuries suffered by Plaintiff.

143.   As a direct and proximate result of Defendants' gross negligence, Plaintiffs have been damaged in an amount in excess of $3,500,000, plus interest, attorney's fees, and costs, and any other relief as provided by law. Plaintiffs' also seek punitive damages if this Court determines that Defendants' conduct constitutes gross negligence or intentional misconduct.

**Count VI - Conversion**

144.   Plaintiffs restate Paragraphs 1 through 101 of the Complaint as if fully rewritten.

145.   Defendants have, without authorization, knowingly asserted dominion and control over Plaintiffs' specific and identifiable property, the investment funds, that are owned and/or properly payable to Plaintiffs.  Defendants' conversion is inconsistent with Plaintiffs' rights and ownership of said property.

146.    Defendants have transferred Plaintiffs' funds directly to themselves for their own benefit, and have knowingly allowed their agents and co-conspirators, the Chans, to use Plaintiffs funds for purposes unrelated to BWF OPP's business purpose.  For example, as is detailed above, Defendants received $330,000 of Plaintiffs' funds on November 3, 2015.

147.    As a direct and proximate result of Defendants' conversion of Plaintiffs' funds, Plaintiffs have been damaged in an amount in excess of $3,500,000, plus interest, attorney's fees, and costs, and any other relief as provided by law.  Plaintiffs' also seek punitive damages if this Court determines that Defendants' conduct constitutes conversion.

### Count VII – Unjust Enrichment/Quantum Meruit

148.    Plaintiffs restate Paragraphs 1 through 101 of the Complaint as if fully rewritten.

149.    Plaintiffs conferred a substantial benefit on Defendants by investing $3,500,000 with BWF OPP.

150.    Defendants have misappropriated, mismanaged and wasted Plaintiffs' investment funds as alleged above.

151.    Defendants agreed to contribute $3,000,000 to BWF OPP, but failed to do so.

152.    Under the circumstances, it would be unjust to Plaintiffs to allow Defendants to retain the benefits conferred upon them by Plaintiffs.

153.    Plaintiffs have been damaged in excess of $3,500,000, plus interest, attorney's fees, costs, punitive damages and other relief as provided by law.

### Count VIII – Conspiracy

154.    Plaintiffs restate Paragraphs 1 through 101 of the Complaint as if fully rewritten.

155.    Defendants, individually and on behalf of the entities they control, entered into a malicious combination to injure Plaintiffs by fraudulently misrepresenting material facts to

Plaintiffs.  These misrepresentations were made to obtain Plaintiffs' investment and convert it for Defendants' own personal gain rather than for the purpose of securing Plaintiffs' EB-5 visas, and fulfilling the purposes of BWF OPP.

156.    Defendants also conspired with the Chans to violate fiduciary duties owed to Plaintiffs, as it detailed above.

157.    As a direct and proximate result of Defendants' civil conspiracy, Plaintiffs have been damaged in an amount in excess of $3,500,000, plus interest, attorney's fees, and costs, and any other relief as provided by law.  Plaintiffs' also seek punitive damages if this Court determines that Defendants' conduct constitutes conspiracy.

## Count IX – Piercing the Corporate Veil

158.    Plaintiffs restate Paragraphs 1 through 101 of the Complaint as if fully rewritten.

159.    Control over BWF OPP, BWF MGMT, and Boardwalk LLC were exercised by Defendants in such a way that those entities should be disregarded because they have no separate mind, will or existence of their own.

160.    Defendants' control over those entities were exercised in such a way as to commit fraud and other illegal acts .

161.    Defendants' corporate form was intentionally utilized to defraud Plaintiffs, convert their funds, and conspire against Plaintiffs.

162.    As a direct and proximate result of Defendants' unlawful acts, Plaintiffs have been damaged in an amount in excess of $3,500,000, plus interest, attorney's fees, and costs, and any other relief as provided by law.

163.    The Court should therefore pierce the corporate veil that Defendants are hiding behind in order to hold them liable to Plaintiffs.

WHEREFORE, Plaintiffs demands judgment against the Defendants for the following relief:

a.      Compensatory damages against Defendants in an amount in excess of $3,500,000, the exact amount to be proven at trial, and statutory damages;

b.      Forfeiture of any fees paid to Defendants;

c.      Punitive damages of at least three times compensatory damages, the exact amount to be determined at trial; and,

d.      Such other relief as the Court deems just and equitable, including pre-judgment and post-judgment interest, costs, and attorney's fees.

Respectfully submitted,

By: __/s/  Christopher D. Cathey_____

Christopher D. Cathey (0663255)
Javier A. Pacheco (51368)
Sara K. White (86014)
Porter, Wright, Morris & Arthur LLP
9132 Strada Place, Third Floor
Naples, FL 34108
(239) 593-2900 (telephone)
(239) 593-2990 (facsimile)
ccathey@porterwright.com
jpacheco@porterwright.com
swhite@porterwright.com
brosado@porterwright.com

## JURY DEMAND

Under Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury.

Respectfully submitted,

By: ___/s/  Christopher D. Cathey_____
        Christopher D. Cathey (0663255)
        Javier A. Pacheco (51368)
        Sara K. White (86014)
        Porter, Wright, Morris & Arthur LLP
        9132 Strada Place, Third Floor
        Naples, FL 34108
        (239) 593-2900 (telephone)
        (239) 593-2990 (facsimile)
        ccathey@porterwright.com
        jpacheco@porterwright.com
        swhite@porterwright.com
        brosado@porterwright.com

12745449v4